## AMBROSINI v. UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF ILLINOIS.

No. 14. Argued December 4, 1901.—Decided October 20, 1902.

Sections 6 and 7 of the War Revenue Act of 1898, 30 Stat. 448, c. 448, pro-
vided for certain stamp taxes on bonds, and other instruments enumer-
ated in Schedule A of the act, but section 17 of the same act exempted
"all bonds, debentures, or certificates of indebtedness issued by the
officers of the United States Government, or by the officers of any State,
county, town, municipal corporation, or other corporation exercising
the taxing power."

The "dramshop act" of Illinois and the Revised Code of Chicago provided
for the giving of bonds by all applicants to whom licenses were granted
to sell liquor in the city of Chicago. Ambrosini gave two such bonds as
required by the state statute but failed to affix thereto United States
revenue stamps, and was indicted for an offence under the War Revenue
Act, tried, found guilty and sentenced to pay a fine after a motion to quash
the indictment had been overruled. Held error and that the indictment
should have been quashed.

The General Assembly of Illinois in enacting the dramshop act legislated
"against the evils arising from the sale of intoxicating liquors" not by
prohibiting, but by regulating, the traffic, and such legislation was in ex-
ercise of the police power which is reserved to the States free from any
Federal restriction material in this action.

Such legislation (and ordinances of the city of Chicago) required bonds to
be given by applicants as prerequisites to the issue of licenses permitting
sales, and the granting of the license was a strictly governmental function

and the giving of the bonds was a part of the same transaction, and to tax either would be to impair the efficiency of state and municipal action; this case, therefore, falls within the general principle that as the means and instrumentalities employed by the General Government to carry into operation the powers granted to it are exempt from taxation by the States, so are those of the States exempt from taxation by the General Government, and viewed in the light of this principle the bonds in question were exempted by section 17 of the War Revenue Act.

THIS was a writ of error brought to reverse a judgment of the District Court imposing a fine on a finding of guilty of an offence under section seven of the act of Congress entitled ".An act to provide ways and means to meet war expenditures, and for other purposes," 30 Stat. 448, c. 448, otherwise known as the War Revenue Act of 1898. The indictment contained two counts. The first charged that defendant on August 30, 1898, executed a certain bond in the penal sum of $3000 to the People of the State of Illinois without affixing to the bond a fifty-cent revenue stamp, alleged to be required by said act of Congress. The second count charged that defendant on August 30, 1898, executed a certain bond to the city of Chicago in the penal sum of $500 without affixing thereto a fifty-cent revenue stamp, alleged to be required by the act. The bonds were set forth *in extenso.* A motion to quash the indictment was made and overruled, and, a jury being waived, the cause was submitted to the court for trial, defendant found guilty, and sentenced to pay a fine. The opinion is reported 105 Fed. Rep. 239.

Sections 6, 7 and 17 of the act are as follows:

" SEC. 6. That on and after the first day of July, eighteen hundred and ninety-eight, there shall be levied, collected, and paid, for and in respect of the several bonds, debentures, or certificates of stock and of indebtedness, and other documents, instruments, matters, and things mentioned and described in Schedule A of this act, or for or in respect of the vellum, parchment, or paper upon which such instruments, matters, or things, or any of them, shall be written or printed by any person or persons, or party who shall make, sign, or issue the same, or for whose use or benefit the same shall be made, signed, or issued, the several taxes or sums of money set down in figures

against the same, respectively, or otherwise specified or set forth in the said schedule. . . .

" SEC. 7. That if any person or persons shall make, sign, or issue, or cause to be made, signed, or issued, any instrument, document, or paper of any kind or description whatsoever, without the same being duly stamped for denoting the tax hereby imposed thereon, or without having thereupon an adhesive stamp to denote said tax, such person or persons shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not more than one hundred dollars, at the discretion of the court, and such instrument, document, or paper, as aforesaid, shall not be competent evidence in any court."

" Sec. 17. That all bonds, debentures, or certificates of indebtedness, issued by the officers of the United States Government, or by the officers of any State, county, town, municipal corporation, or other corporation exercising the taxing power, shall be, and hereby are, exempt from the stamp taxes required by this act: *Provided*, That it is the intent hereby to exempt from the stamp taxes imposed by this act such State, county, town, or other municipal corporations in the exercise only of functions strictly belonging to them in their ordinary governmental, taxing, or municipal capacity: *Provided further*, That stock and bonds issued by coöperative building and loan associations. whose capital stock does not exceed ten thousand dollars, and building and loan associations or companies that make loans only to their shareholders, shall be exempt from the tax herein provided."

Schedule A contained this provision:. " Bond: For indemnifying any person or persons, firm, or corporation who shall have become bound or engaged as surety for the payment of any sum of money, or for the due execution or performance of the duties of any office or position, and to account for money received by virtue thereof, and all other bonds of any description, except such as may be required in legal proceedings, not otherwise provided for in this schedule, fifty cents."

The bonds, to which it was alleged the stamps should have been affixed, were bonds required by the laws of Illinois to be given as a condition of the issue of licenses to keep dram shops

or sell intoxicating liquors in the State of Illinois and in the city of Chicago.

Sections one, two and five of an act of the general assembly of the State of Illinois, entitled " An act to provide for the licensing of and against the evils arising from the sale of intoxicating liquors," read :

" § 1. That a dram-shop is a place where spirituous or vinous or malt liquors are retailed by less quantity than one gallon, and intoxicating liquors shall be deemed to include all such liquors within the meaning of this act.

" § 2. Whoever, not having a license to keep a dram-shop, shall, by himself or another, either as principal, clerk or servant, directly or indirectly, sell any intoxicating liquor in any less quantity than one gallon, or in any quantity to be drank upon the premises, or in or upon any adjacent room, building, yard, premises or place of public resort, shall be fined not less than twenty dollars ($20) nor more than one hundred dollars ($100), or imprisoned in the county jail not less than ten nor more than thirty days, or both, in the discretion of the court."

" § 5. No person shall be licensed to keep a dram-shop, or to sell intoxicating liquors, by any county board, or the authorities of any city, town or village, unless he shall first give bond in the penal sum of $3000, payable to the People of the State of Illinois, with at least two good and sufficient sureties, freeholders of the county in which the license is to be granted, to be approved by the officer who may be authorized to issue the license, conditioned that he will pay to all persons all damages that they may sustain, either in person or property, or means of support, by reason of the person so obtaining a license selling or giving away intoxicating liquors. The officer taking such bond may examine any person offered as security upon any such bond, under oath, and require him to subscribe and swear to his statement in regard to his pecuniary ability to become such security. Any bond taken pursuant to this section may be sued upon for the use of any person, or his legal representatives, who may be injured by reason of the selling or giving away any intoxicating liquor by the person so licensed, or by his agent or servant." 2 Starr & Curtis, Anno. Stat. Ill. (2d ed.) 1586, c. 43.

By article five, chapter 24, of the statutes of Illinois concerning cities, it was provided:

"§ 1. The city council in cities, and president and the board of trustees in villages, shall have the following powers . . .

"*Fourth.* To fix the amount, terms and manner of issuing and revoking licenses. . . .

"*Forty-sixth.* To license, regulate and prohibit the selling or giving away of any intoxicating, malt, vinous, mixed or fermented liquor, the license not to extend beyond the municipal year in which it shall be granted, and to determine the amount to be paid for such license: . . . *Provided, further,* That in granting licenses, such corporate authorities shall comply with whatever general law of the State may be in force relative to the granting of licenses."

". . . *Ninety-sixth.* To pass all ordinances, rules, and make all regulations proper or necessary to carry into effect the powers granted to cities or villages, with such fines or penalties as the city council or board of trustees shall deem proper: . . ." 1 Starr & Curtis (2d ed.), 689, c. 24.

The Revised Code of Chicago of 1897, provided: "The mayor of the city of Chicago shall, from time to time, grant licenses for the keeping of dram shops within the city of Chicago to persons who shall apply to him in writing therefor, and shall furnish evidence satisfying him of their good character. Each applicant shall execute to the city of Chicago a bond, with at least two sureties, to be approved by the city clerk or city collector, in the sum of five hundred dollars, conditioned that the applicant shall faithfully observe and keep all ordinances in force at the time of the application or thereafter to be passed during the period of the license applied for, and will keep closed, on Sundays, all doors opening out upon any street from the bar or room where such dram shop is to be kept; and that all windows opening upon any street from such bar or room shall, on Sundays, be provided with blinds, shutters or curtains, so as to obstruct the view from such street into such room. No application for a license shall be considered until such bond shall have been filed." 1 Rev. Code, 1897, p. 253, c. XXXIX, art. I.

The ordinance contained many other specific regulations of the traffic, and provided that licenses might be revoked by the mayor for violation of " any provision of any ordinance of the city council relating to intoxicating liquors, or any condition of the bond aforesaid."

The conditions of the bond in the sum of $3000 to the People of the State of Illinois were substantially in the words of the statute. The conditions of the bond in the sum of $500 to the city of Chicago were somewhat more stringent than the language of the municipal code.

*Mr. T. A. Moran* and *Mr. Levy Mayer* for plaintiff.

*Mr. Assistant Attorney General Beck* for defendants in error.

MR. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

By the dramshop act the general assembly of Illinois legislated, as was stated in the title of the act, " against the evils arising from the sale of intoxicating liquors," not by prohibiting the traffic altogether, but by regulating it in protection of the public. The act concerning cities authorized municipal action subject to the general law.

The legislation was enacted in the exercise of the police power for the safety, welfare and health of the community, and it is conceded that that power is a power reserved by the States, free from Federal restriction in any particular material here.

The act and the ordinance required these bonds to be given as prerequisites to the issue of licenses permitting the sale. The licenses could not be issued without compliance with this condition precedent. The statute expressly provided that no license should be granted unless the applicant " shall first give bond in the penal sum of $3000," and the ordinance, that " no application for a license shall be considered until such bond shall have been filed."

—The bonds were obviously intended to secure the proper enforcement of the laws in respect of the sale of intoxicating liq-

uors; the prompt payment of fines and penalties; a remedy for injuries in person, property or means of support; and the protection of the public in divers other enumerated particulars. The granting of the licenses was the exercise of a strictly governmental function, and the giving of the bonds was part of the same transaction. To tax the license would be to impair the efficiency of state and municipal action on the subject and assume the power to suppress such action. And considering license and bond together, taxation of the bond involves the same consequences. In themselves the bonds were not mere incidents of the regulation of the traffic, but essential safeguards against its evils, and governmental instrumentalities of State and of city, as authorized by the State, to insure the public welfare in the conduct of the business, although the business itself was not governmental. They were not mere individual undertakings to secure a personal privilege as suggested by the court below, but means for the preservation of the peace, the health and the safety of the community in compelling strict observance of the law, and remedying injurious results.

The general principle is that as the means and instrumentalities employed by the General Government to carry into operation the powers granted to it are exempt from taxation by the States, so are those of the States exempt from taxation by the General Government. It rests on the law of self-preservation, for any government, whose means employed in conducting its strictly governmental operations are subject to the control of another and distinct government, exists only at the mercy of the latter. Nelson, J., *Collector* v. *Day*, 11 Wall. 113.

Viewed in the light of that general principle, we think it clear that Congress, lest the broad language of Schedule A, " and all other bonds of any description," might literally cover bonds such as those in question, and in avoidance of controversy in that regard, exempted them by section 17, wherein it was declared that it was intended " to exempt from stamp taxes imposed by this act, such State, county, town, or other municipal corporations in the exercise only of functions strictly belonging to them in their ordinary governmental, taxing or municipal capacity." True, this language was used in a proviso, and the

enacting clause exempted bonds ·" issued by the officers of any State, county, town, municipal corporation or other corporation exercising the taxing power; " but as the bonds were required by the State and the city and were issued for the benefit of the public and not for the benefit of the individuals who executed them, it appears to us that they came fairly within the meaning of the clause, assuming that they were covered by Schedule A. The question is whether the bonds were taken in the exercise of a function strictly belonging to the State and city in their ordinary governmental capacity, and we are of opinion that they were, and that they were exempted as no more taxable than the licenses. Either they were exempt, apart from the proviso, because, in the sense of the statute, issued by the State and city, or the proviso so far qualified the language of the enacting clause as to exempt them in exempting the State and city in respect.of the exercise of strictly governmental functions.

We conclude, therefore, that they were not taxable within the statute. *United States* v. *Owens,* 100 Fed. Rep. 70; *Stirneman* v. *Smith,* 100 Fed. Rep. 600; *Warwick* v. *Bettman,* 102 Fed. Rep. 127; *S. C.,* 108 Fed. Rep. 46; *People* v. *City,* 31 C. L. N. 247.

*Judgment reversed and cause remanded with a direction to quash the indictment.*

Mr. Justice Harlan did not hear the argument and took no part in the decision.